UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2025 AUG 22  AM 9: 29

CLERK

BY_____
DEPUTY CLERK

CHAD P.,                          )
                                  )
            Plaintiff,            )
                                  )
    v.                            )    Case No. 2:24-cv-00420-cr
                                  )
FRANK BISIGNANO, Acting           )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE COMMISSIONER'S DECISION AND
GRANTING THE COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 11 & 16)

Plaintiff Chad P. is a claimant for a Period of Disability ("PD"), Disability
Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments under
the Social Security Act ("SSA") and brings this action pursuant to 42 U.S.C. § 405(g) to
reverse the decision of the Social Security Commissioner (the "Commissioner") that he is
not disabled. (Doc. 11.) The Commissioner moves to affirm. (Doc. 16.)

After Plaintiff's applications for PD, DIB, and SSI were denied initially and on
reconsideration by the Social Security Administration, Administrative Law Judge
("ALJ") Dory Sutker found Plaintiff ineligible for benefits because he was not disabled
within the meaning of the SSA.[1] Plaintiff administratively appealed the decision, and the
Appeals Council denied review, at which point the ALJ's decision became final.

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than
[twelve] months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or
mental impairment or impairments" must be "of such severity" that the claimant is not only
unable to do any previous work but cannot, considering the claimant's age, education, and work

On appeal, Plaintiff argues ALJ Sutker erred by giving greater weight to the medical opinions of the state agency consultants ("the Consultants") and little weight to the medical opinions of Plaintiff's treating physicians. He further argues ALJ Sutker erred in concluding that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Plaintiff seeks an Order reversing the final decision of the Commissioner and an Order remanding the matter for a calculation of benefits. Alternatively, Plaintiff requests an Order reversing and remanding this matter for further proceedings.

Plaintiff is represented by Mary C. Welford, Esq. Special Assistant United States Attorney Vernon Norwood represents the Commissioner.

## I.    Procedural History.

Plaintiff filed his applications for PD, DIB, and SSI on April 18, 2022, alleging his disability began on December 31, 2019, based on his lower lumbar pain. Plaintiff's claims were initially denied on June 17, 2022, and again upon reconsideration on November 18, 2022. Plaintiff thereafter timely filed a request for a hearing, which was held on April 25, 2023, by videoconference before ALJ Sutker. Plaintiff; his fiancée, Julia Guile; and Vocational Expert ("VE") Renee Jubrey testified.

On May 31, 2023, ALJ Sutker issued an unfavorable decision which Plaintiff administratively appealed. The Appeals Council denied review on February 16, 2024. As a result, the ALJ's disability determination stands as the Commissioner's final decision.

## II.    ALJ Sutker's May 31, 2023 Decision.

At the onset date, Plaintiff was forty-four years old, "which is defined as a younger individual age [eighteen to forty-nine.]" (Doc. 8-1 at 29.) Plaintiff has at least a high school education, and his past employment includes work as a lathe tender and parts salesperson. On October 14, 2022, Plaintiff was observed to be 5'9" tall and to weigh 377 pounds.

---

experience, engage in any other kind of substantial gainful work which exists in the national economy[.] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In order to receive DIB and SSI under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" [("RFC")] assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at steps one through four of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

At Step One, ALJ Sutker determined Plaintiff had met the SSA's insured status requirements through September 30, 2025, and that he had not engaged in substantial gainful activity since December 31, 2019, the alleged onset date.

At Step Two, ALJ Sutker determined Plaintiff suffered from three severe impairments: lumbar spinal stenosis, disorder of the spine, and obesity. She further determined Plaintiff had "the nonsevere disorder of chronic ischemic heart disease[,]" (Doc. 8-1 at 25), and that although Plaintiff alleged that he suffered from peripheral neuropathy with tingling and numbness in the extremities, the "record d[id] not support a medically determinable diagnosis consistent with these symptoms[,]" meaning "this [was] a non-medically determinable impairment." *Id.*

3

At Step Three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listings because "[n]o treating or examining physician ha[d] proffered findings that [we]re equivalent in severity to the criteria of these or any other listed impairment." *Id.* In making her Step Three determination, ALJ Sutker "considered the opinions of the [Consultants.]" *Id.*

At Step Four, the ALJ determined Plaintiff had the RFC to:

> [P]erform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can lift and carry [twenty] pounds occasionally, and [ten] frequently, stand and/or walk for a total of [four] hours in an [eight] hour day, sit for about [six] hours in an [eight] hour day with normal breaks and rest periods, and must be able to change positions from sit to stand or vice versa for an aggregate of [three]-[five] minutes per hour. In addition, the claimant can never climb ladders, ropes[,] or scaffolds and can perform other postural activities on an occasional basis. He can never be exposed to extreme cold, wetness, excessive vibrations[,] and unprotected heights.

*Id.*

During the April 25, 2023 hearing, ALJ Sutker asked the VE hypothetical questions regarding the jobs available to a person of Plaintiff's age, education level, and RFC. The VE opined that Plaintiff would not be able to return to his past work as a lathe tender or a parts salesperson. When asked whether there was any substantial gainful activity an individual with Plaintiff's RFC could perform, the VE identified cashier II, mail clerk, and marker. She also identified three sedentary jobs: document preparer, callout operator, and addresser.

Considering Plaintiff's age, education, work experience, and RFC, ALJ Sutker determined at Step Five that jobs exist in significant numbers in the national economy which Plaintiff could perform, including light jobs such as cashier II (approximately 53,000 jobs nationally),[2] a mail clerk (approximately 12,000 jobs nationally), or a marker (approximately 130,000 jobs nationally), and sedentary jobs such as document preparer

---

[2] During the April 25, 2023 hearing, VE Jubrey recognized that "the cashier II [position] encompasses numerous types of cashiering[,]" (Doc. 8-1 at 81), so she "changed [her] numbers by [ninety] percent[]" to account only for the jobs that are within a booth. *Id.*

(approximately 15,000 jobs nationally), a callout operator (approximately 3,000 jobs nationally), or an addresser (approximately 2,000 jobs nationally). As a result, the ALJ concluded Plaintiff was not disabled.

## III.    Conclusions of Law and Analysis.

### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). "[W]hen the record contains competing medical opinions, it is the role of the Commissioner to resolve such conflicts." *Diana C. v. Comm'r of Soc. Sec.*, 2022 WL 1912397, at *7 (S.D.N.Y. Apr. 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The court does not defer to the Commissioner's decision if it "is based on an error of law." *Juarez ex rel. R.R.O. v. Saul*, 800 F. App'x 63, 64 (2d Cir. 2020) (summary order). "Even if the Commissioner's decision is supported by substantial evidence, legal

error alone can be enough to overturn the ALJ's decision." *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 732 (S.D.N.Y. 2018) (internal quotation marks omitted) (quoting *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009)).

**B.    Whether the ALJ's Evaluation of the Medical Opinions is Supported by Substantial Evidence.**

Plaintiff argues that ALJ Sutker committed legal error when she decided not to credit the medical opinions of his treating and examining providers and instead credited the opinions of the Consultants. Specifically, Plaintiff contends the ALJ accepted the Consultants' opinions by "broadly stat[ing] that they are consistent with the substantial evidence of record and the longitudinal treatment record[,]" (Doc. 11 at 8) (citation and internal quotation marks omitted), and "d[id] not explain why the [C]onsultants' opinions are more supportable or consistent tha[n] those of the treating and examining providers." *Id.*

"When making a determination of disability, an ALJ must consider all of the available evidence in the individual's case record, including the opinions of medical sources." *Karen S. v. Comm'r of Soc. Sec.*, 2020 WL 4670911, at *13 (D. Vt. Aug. 11, 2020) (internal quotation marks, alteration, and citation omitted). An ALJ must articulate *how* they considered medical opinions and prior administrative findings, as well as *how persuasive* they found them. 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).

An ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider each medical opinion or prior administrative finding in the record and evaluate its persuasiveness in accordance with five factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including (i) length of treatment relationship, (ii) frequency of examinations, (iii) purpose of treatment relationship, (iv) extent of treatment relationship, and (v) examining relationship); (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *See id.* §§ 404.1520c(c), 416.920c(c).

The factors of supportability and consistency "are the most important factors [an ALJ] consider[s]" when determining the persuasiveness of a medical opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ must therefore articulate how he or she considered the supportability and consistency of a medical opinion and may, but need not, address the remaining three factors. *Id.* Supportability refers to "how well a medical source supported and explained their opinion[,]" and "consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Vellone ex rel. Vellone v. Saul*, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).

The court "may not 'create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself." *Petersen v. Astrue*, 2 F. Supp. 3d 223, 234 (N.D.N.Y. 2012) (quoting *Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005)); *see also Dunsford v. Comm'r of Soc. Sec.*, 2023 WL 2242083, at *7 (N.D.N.Y. Feb. 27, 2023) (explaining that the court "will 'judge the propriety of [the ALJ] solely by the grounds invoked by [the ALJ]' rather than the Commissioner's subsequent ad-hoc justification") (alterations in original) (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). For this reason, the court describes the opinions at issue in more detail than provided by the ALJ before addressing the ALJ's analysis.

On December 19, 2019, orthopedic surgeon Michaela Schneiderbauer, M.D., evaluated Plaintiff in response to his complaint of lower back pain. Plaintiff reported he had suffered this pain since October and that, despite attending physical therapy twice per week, he had not seen an improvement in his symptoms. Upon examining Plaintiff, Dr. Schneiderbauer noted he had "normal gait, no limp, and ambulat[ed] with no assistive devices." (Doc. 8-1 at 610.) Examination of his lumbar spine revealed tenderness of the right paraspinal region. His motor strength and neurological tests were both unremarkable. Dr. Schneiderbauer opined:

> Based on history and physical exam findings[,] the [patient] exhibits symptoms of mechanical low back pain with likely repetitive strain injury

to his right sided paraspinal musculature on the right side. No neuro-
muscular deficits in bilateral lower extremities. Weight loss, continuation of
physical therapy with core strengthening, avoidance of aggravating
activities, over[-]the[-]counter pain medication as needed and follow[-]up
with primary care was recommended.

*Id.* at 611. From November 2020 to March 2022, Plaintiff underwent chiropractic care.[3]

On June 21, 2020, Plaintiff saw Jennifer Steinhoff, FNP ("NP Steinhoff"), for
swelling in his leg. During this visit, Plaintiff reported he was a pitcher for a softball
team. A week before his visit, he had been "struck on the mid anterior left calf by a batted
ball." *Id.* at 461. Plaintiff followed up with NP Steinhoff on June 28, 2020, regarding his
left calf injury. In her appointment notes, NP Steinhoff noted Plaintiff was a "member of
the fire department[.]" *Id.* at 525.

Plaintiff saw NP Steinhoff again on September 11, 2020, again reporting he had
been hit in his right leg with a softball a week and a half before his visit. On October 2,
2020, Plaintiff was seen by NP Steinhoff, this time for his complaint of right lumbar pain.
NP Steinhoff again noted that Plaintiff was a "member of the fire department[.]" *Id.* at
513. She made an orthopedic referral to determine whether an epidural injection would
alleviate Plaintiff's pain.

During a January 12, 2021 appointment, Plaintiff reported his lower back pain had
generally improved. He did, however, note that he felt "a small increase of discomfort
[the day before,] and he attribute[d] this to doing some fireman work directing traffic in
the cold for a few hours." *Id.* at 639. Two weeks later, on January 26, 2021, Plaintiff
similarly reported an improvement in his lower back symptoms, except for "when he had
to drive to St. Johnsbury[.]" (Doc. 8-1 at 641.) On February 9, 2021, Plaintiff again
reported his symptoms had been aggravated because "he had to drive a total of [six]
hours and he played a few games of ball[.]" *Id.* at 643.

---

[3] In certain instances, Plaintiff reported chiropractic care worsened his symptoms. *See, e.g.*, Doc.
8-1 at 417, 499. On other dates, Plaintiff stated chiropractic care helped alleviate his lower back
pain. *See, e.g., id.* at 386, 720.

On March 22, 2021, Plaintiff complained of lower back pain and soreness. He reported he had "a large softball tournament in which he played [five] games and thinks he 'over did it . . . [.]'" *Id.* at 651. Three days later, on March 25, 2021, Plaintiff was seen for worsening pain in his lower back. During this visit, Plaintiff stated he was a member of the fire department. Plaintiff followed up with NP Steinhoff on March 31, 2021, and she also noted Plaintiff was a member of the fire department during that visit.

On April 6, 2021, Plaintiff saw Nicholas M. Darcangelo, D.C., for complaints of lower back discomfort. Although he reported his condition had mildly improved, he stated he had played softball during the weekend, which triggered some discomfort that ultimately resolved. Plaintiff was seen nearly two weeks later, on April 19, 2021, by Trudy Roberts, APRN, at the Dartmouth-Hitchcock Medical Center, Center for Pain and Spine. He reported that he was a volunteer firefighter but he could not "do the hoses or any lifting but d[id] what he can." *Id.* at 386. He also stated his lower back pain interfered with his ability to play softball and stretch.

During a July 26, 2021 visit with Norr Hashem, D.O., Plaintiff's primary care provider, Plaintiff complained of right lower back pain, which he characterized as chronic and nagging. He rated his pain a seven out of ten and said he was in pain at the time of his appointment. Dr. Hashem diagnosed Plaintiff with "chronic pain/dorsalgia[,]" (Doc. 8-1 at 494), and advised him to apply heat and to stretch. Plaintiff was instructed to restart Celebrex, which he had stopped taking prior to receiving a sacroiliac joint injection. Plaintiff followed up with Dr. Hashem on August 26, 2021, who reiterated his diagnosis of "chronic pain/dorsalgia[,]" *id.* at 489, and again encouraged Plaintiff to apply heat and to stretch. Dr. Hashem also prescribed Plaintiff gabapentin and referred him to a physical therapist. At this visit, Plaintiff advised that he remained a member of the fire department.

On November 4, 2021, Plaintiff treated with Dr. Hashem, who noted Plaintiff's general appearance was healthy, he did not appear to be in acute distress, and he was able to ambulate without assistance. Neurologic tests revealed Plaintiff's gait and station were normal, his cranial nerves were "grossly intact[,]" *id.* at 402, and he presented with

"lumbar paraspinal hypertonicity." *Id.* Dr. Hashem diagnosed Plaintiff with radiculopathy in the lumbar region, referred him to a pain management specialist, and prescribed Plaintiff 800 milligrams of gabapentin three times a day as needed. Plaintiff again reported he was a member of the fire department.

Plaintiff saw Robert Giering, M.D., on February 10, 2022. During that appointment, Dr. Giering observed Plaintiff had a "wide-based gait," his posture was stiff, and his "[r]ange of motion [wa]s painful with extension and rotation to the right." *Id* at 673. Dr. Giering also noted Plaintiff had "increased lordosis" and "[t]enderness to palpation[]" on his "right paravertebral and right gluteus medius." *Id.* He recommended Plaintiff receive a lumbar epidural steroid injection at L5-S1 "based on [his] pain distribution [and the] lack of effectiveness of prior [sacroiliac joint] injections." (Doc. 8-1 at 674.)

Plaintiff saw Dr. Giering on March 21, 2022, for a lumbar epidural steroid injection procedure with fluoroscopic guidance at L5-S1. After evaluating Plaintiff, Dr. Giering scheduled him for injection therapy and concluded: "The procedure is necessary and indicated in order to relieve pain and suffering, and to return the patient to as high a level of functionality as possible. The patient has tried and failed conservative treatment." *Id.* at 614.

Dr. Giering arrived at this determination:

[B]ased on: the presence of severe pain, referral patterns to the extremity, as a dominant feature of the pain syndrome. The patient does also appear on imaging studies available to me to have a disk or stenosis problem that confirms and supports the diagnosis given above. The patient has trialed multiple medications for this problem and has not been able to resolve the problem using medications. The patient has also done a considerable amount of stretching and/or formal physical therapy for this problem, without adequate relief of the problem.

*Id.*

After the appointment, Plaintiff planned to "driv[e] down to South Carolina for a softball tournament." *Id.* at 665. On April 11, 2022, Plaintiff had a follow-up appointment with Dr. Giering regarding the injections where Plaintiff reported his pain was reduced by

60 to 70 percent for three weeks and that his pain at the time was a three or four out of ten. Plaintiff's treatment plan was to repeat the injection procedure in three to four months if needed to address his symptoms. Two weeks later, on April 25, 2022, Plaintiff reported to Dr. Giering that although he "[i]nitially did get excellent relief with this injection . . . after about three weeks his pain did return." *Id.* at 676. Dr. Giering's notes of this visit reflect the following:

> Offered trial of one time repeat of this epidural injection, at the prior level. I explained that a second dose of steroid may be required in order to provide more substantial relief of his pain[;] however, I also emphasized that if [a] repeat injection failed to provide more substantial and sustained pain relief[,] we would not continue injection therapy at that time.

*Id.*

On June 22, 2022, Dr. Giering administered a second lumbar epidural steroid injection at the L5-S1 level. On July 12, 2022, in a post procedure evaluation, Plaintiff reported his pain was reduced by 90 percent for three weeks, but his pain at the time of the appointment was an eight out of ten. At that time, in addition to the injections, Plaintiff was treating his pain with weekly chiropractic appointments. Dr. Giering diagnosed Plaintiff with radiculopathy in the lumbar region and referred Plaintiff to a specialist for a surgical opinion.

Pursuant to Dr. Giering's referral, on October 3, 2022, Plaintiff saw Todd Lefkoe, M.D., a physician at a pain and spine center. Dr. Lefkoe's progress notes state that Plaintiff reported the onset of his right low lumbar pain occurred in October 2019. In an attempt to address his symptoms, Plaintiff attended physical therapy until July 2020 and obtained two right sacroiliac joint injections on May 5, 2021, and June 23, 2021, which did not provide him with sustained relief. Plaintiff subsequently reported undergoing interlaminar epidural steroid injections on March 21, 2022, and June 22, 2022. This treatment also failed to provide Plaintiff with sustained relief. At the time of his appointment with Dr. Lefkoe, Plaintiff reported his pain was constant and rated it an eight out of ten. He identified "sitting, prolonged ambulation, right side-lying and sit to stand,

bed, or car transfers[]" as exacerbating factors. *Id.* at 731. Lying in the left side-lying or prone positions helped alleviate his symptoms.

During his visit with Plaintiff, in addition to reviewing Plaintiff's relevant medical history, Dr. Lefkoe reviewed a January 30, 2020 MRI. He noted: "[i]t demonstrates disc space narrowing at L4-L5 with a small left paracentral disc protrusion, resulting in mild compression of the left L5 nerve root. There is also a right subarticular disc protrusion at L5-S1 that abuts, but does not displace, the right S1 nerve root." *Id.* Dr. Lefkoe examined Plaintiff and noted his gait had "an overall waddling and [wa]s marked by an increased base of support." (Doc. 8-1 at 732.) Dr. Lefkoe's examination revealed tenderness of the "right quadratus lumborum, right sacroiliac joint[,] and throughout the right central buttock and right hip bursae. Additional tenderness [wa]s noted over [the] left hip greater trochanter. There [wa]s mild tenderness over the sacrum[,]" and "[l]umbopelvic rhythm [wa]s impaired." *Id.*

In his report, Dr. Lefkoe observed that Plaintiff reported his pain was exacerbated by "[s]itting, prolonged ambulation, right side-lying[,] and sit to stand, bed or car transfers." Nurse Roberts noted Plaintiff reported his pain limited his volunteer firefighter activities and interfered with his ability to stand and play softball. Dr. Lefkoe diagnosed Plaintiff with "[c]hronic right-sided low back pain with right-sided sciatica[,]" "[l]umbar spondylosis[,]" and "[d]isplacement of lumbosacral intervertebral disc[.]" *Id.* at 732. He noted that Plaintiff's "symptoms [we]re not easily explained by the lumbar MRI findings of January 2020[,]" nor did they "appear to be associated with neural impingement[,]" and they might have a "myofascial component[.]" *Id.* at 732, 733. Dr. Lefkoe referred Plaintiff for lumbar medial branch blocks and radiofrequency ablation.

On October 14, 2022, Plaintiff was seen by Eric Seyferth, M.D. Upon examining Plaintiff's back, Dr. Seyferth noted:

> Mild tenderness in the paralumbar musculature in the right lower lumbar region but not over the bony structures of the spine or pelvis. There was markedly little range of motion from L1 to L5 with almost all of his back range of motion occurring in the thoracic spine with only 30 degrees of flexion, 5 degrees of extension, 30 degrees of lateral bending, and 30

degrees of rotation. There was increased lumbar lordosis. Straight leg raise produced pain in the right low back at 90 degrees on the right without radicular symptoms, normal on the left.

*Id.* at 721.

Based on his examination of Plaintiff and his review of the relevant medical history, Dr. Seyferth concluded Plaintiff suffered from:

Right low back pain and bilateral radicular pain and weakness, probably a dull 4-5. He has significant limitation of function, as described above, with a markedly abnormal back exam and mild weakness and sensory loss in the right lower extremity. Radicular symptoms are probably due to disc herniation[,] and his back symptoms are probably a combination of facet arthritis, degenerative disc disease, and chronic ligamentous strain. He has not responded to aggressive conservative treatment and is being considered for medial branch blocks, but I do not have high hopes that these will provide good efficacy. His severe obesity is playing a role in the difficulty achieving improvement.

*Id.* at 722.

Plaintiff filled out a disability report on December 14, 2022. Therein he stated he "[n]eed[ed] help with personal needs (dressing, bathing[,] etc[.]),]" and that it was "very hard to drive and get in and out of [the] car[.]" (Doc. 8-1 at 303.)

On referral by Dr. Lefkoe, Plaintiff saw Kimberly Youngren, M.D., on December 15, 2022. Plaintiff reported right lower back pain that radiated to his right posterolateral hip and posterior thigh down to his knee. He rated his pain a ten out of ten, and stated a "[two-]hour ride kill[ed] it, can't even drive across town[.]" *Id.* at 766. Plaintiff also reported occasional tingling in his right thigh. Upon examining Plaintiff, Dr. Youngren noted his lumbar paraspinal muscles were tender to palpation. Plaintiff's sacroiliac joint provocative testing was positive on his right side and "[f]acet loading [wa]s [p]ositive on" his right side. *Id.* at 768. Plaintiff's hip flexion, knee extension, ankle dorsiflexion, long toe extension, and ankle plantarflexion were all normal.

Pursuant to her review of Plaintiff's chart and her examination of him, Dr. Youngren diagnosed Plaintiff with "[r]adiculopathy of lumbar region" and "[s]pondylosis of cervical region without myelopathy or radiculopathy[.]" *Id.* at 769. Dr. Youngren

ordered an MRI of Plaintiff's lumbar spine to inform a future course of treatment and advised Plaintiff to continue with his at-home exercise program.

On January 18, 2023, Plaintiff underwent a lumbar MRI, which revealed:

L4-5: 1.8 x 1.3 cm disc protrusion in both paracentral and both far lateral regions, slightly greater on the left side displacing the thecal sac posteriorly, probably in contact with both L5 nerves.

L5-S1: 1.4 x 0.7 x 0.9 cm central disc protrusion.

*Id.* at 772.

Dr. Hashem completed an RFC Form for Plaintiff on April 19, 2023, and opined that Plaintiff was unable to perform bending, squatting, kneeling, and turning motions. He further noted Plaintiff suffered from lumbar radiculopathy which caused him pain when he climbed stairs and required him to lie down during the day.

On June 6, 2022, Edward Haak, D.O., conducted a consultative examination at the state agency's request, to review medical and non-medical evidence. Dr. Haak listed "[two] slipped disc[s] [at] L4-L5 w[ith] pinched nerves, arthritis" as Plaintiff's chief complaints. *Id.* at 89. Upon review of the evidence, Dr. Haak opined:

Cl[aimant] has [a] h[istory] of disc protrusion/annular tear [at] L5-S1 w[ith] compression [at the] L5 nerve, and subchondral sclerosis [bilateral sacroiliac] j[oin]ts. Cl[aimant's] obesity . . . is felt to be a sig[nificant] factor in pain/limitations as well. Cl[aimant] is w[ith] chronic severe [lower back pain], severe obesity[,] and mild-mod[erate] antalgic gait. With these considerations, a[n] RFC of 20/10/4/6[4] with postural and environmental/hazards limitations is felt reasonable.

(Doc. 8-1 at 91.)

---

[4] In his report, Dr. Haak recommended the following limitations for Plaintiff: (1) that he occasionally lift and/or carry no more than twenty pounds, (2) that he less than frequently lift and/or carry no more than ten pounds, (3) that he not stand and/or walk for more than a total of four hours, and (4) that he not sit for more than a total of six hours in an eight-hour workday. Dr. Haak further noted Plaintiff "[m]ust periodically alternate sitting and standing to relieve pain and discomfort[.]" (Doc. 8-1 at 92.) Dr. Haak additionally found Plaintiff should avoid concentrated exposure to extreme cold and hot conditions, wetness, and vibration and moderate exposure to hazards such as machinery and heights.

14

Dr. Haak further noted:

Cl[aimant] noted a number of exertional and postural
allegations/limitations, all of which are not supported by the medical
evidence. Cl[aimant] noted in Func[tional] Rep[or]t that he has diff[iculty]
using his hands[;] however Cl[aimant] had no sig[nificant] complaints or
exam findings re[garding] diff[iculty] with his hands in current [medical
evidence of record ("]MER["]). Felt that Cl[aimant's] allegations are
partially consistent with medical evidence available.

*Id.* at 92. Dr. Haak also determined that Plaintiff was able to drive but that he "[d]oes no

household chores or cooking[.]" *Id.* at 106. Dr. Haak noted evidence "of disc

protrusion/annular tear [at] L5-S1 w[ith] compression [at the] L5 nerve, and subchondral

sclerosis [bilateral sacroiliac] j[oin]ts." *Id.* at 93.

On November 17, 2022, Geoff Knisely, M.D., conducted a second consultative

examination upon the state agency's request. In his report, Dr. Knisely concluded:

[T]he claimant has . . . [degenerative disc disease at] L4/5 and L5/S1
without objective evidence [of] radiculopathy. Not [a] surgical candidate.
Normal gait. Allegations [that he is] only able to walk a few steps [are] not
consistent with available MER and symptoms [are] not able to be explained
by MRI findings. Does not use assistive devices.

*Id.* at 107. He similarly concluded that although Plaintiff was able to drive, he "d[id] no

household chores or cooking[.]" *Id.* at 114. Dr. Knisely proposed the same RFC[5] as Dr.

Haak based on Plaintiff's history "of disc protrusion/annular tear [at] L5-S1 w[ith]

compression [at] L5 nerve, and subchondral sclerosis [bilateral] [sacroiliac] j[oin]ts. . . .

With chronic pain it is reasonable for Cl[aimant] to change positions for an aggregate of

[three]-[five ]min[utes] per hour." (Doc. 8-1 at 108.)

---

[5] In his report, Dr. Knisely states "Limitation is 10/10[] with walk/stand 4 hrs due to
[degenerative disc disease in the] lumbar spine compounded by morbid obesity." (Doc. 8-1 at
107.) He opined that Plaintiff (1) should be limited to occasionally lifting and/or carrying no
more than twenty pounds, (2) should be limited to less than frequently lifting and/or carrying no
more than ten pounds, (3) should not stand and/or walk for more than a total of four hours, and
(4) should not sit for more than six hours in an eight-hour workday. Like Dr. Haak, Dr. Knisely
also noted Plaintiff "[m]ust periodically alternate sitting and standing to relieve pain and
discomfort[.]" (Doc. 8-1 at 108.) Regarding environmental limitations, Dr. Knisely found
Plaintiff should avoid concentrated exposure to extreme cold conditions, as well as wetness,
vibration, and hazards such as machinery and heights.

## 1.    Treating Physicians' Opinions.

Plaintiff argues that ALJ Sutker's analysis of Dr. Hashem's opinion "does not meet the standard set out in the [SSA] regulations[,]" (Doc. 11 at 7), and that her conclusion that Dr. Hashem's opinion is only partially persuasive is therefore erroneous. "To determine whether [a p]laintiff's symptoms affect [his or] her ability to work, the ALJ is required . . . to consider medical opinion evidence, objective medical evidence, other medical evidence, and non-medical evidence[.]" *Courtney L. W. v. Comm'r of Soc. Sec.*, 2022 WL 685290, at *6 (N.D.N.Y. Mar. 8, 2022). "'A medical opinion is a statement from a medical source about what [a claimant] can still do despite [his or her] impairment(s) and whether [he or she] ha[s] one or more impairment-related limitations or restrictions in the abilities' to: perform physical, mental, and other demands of work; and adapt to environmental conditions." *Id.* at n.9 (citing 20 C.F.R. §§ 416.913(a)(2)(i)(A)-(D)). "Other medical evidence is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of [a claimant's] impairments, [his or her] medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis."[6] *Id.* at n.11 (citing 20 C.F.R. § 416.913(a)(3)).

ALJ Sutker found partially persuasive Dr. Hashem's April 19, 2023 RFC Form and agreed with Dr. Hashem's assessment that Plaintiff "is unable to sit/stand [six] out of [eight] hours in one day and that he cannot perform his past work[,]" (Doc. 8-1 at 29), but disagreed that "[Plaintiff] can never b[e]nd, squat, kneel[,] or turn any part of his body[,]" because she found that conclusion "[wa]s inconsistent with the [Plaintiff's] ability to drive, play softball as a pitcher[,] and cook." *Id.* The ALJ also noted Dr. Hashem's "form

---

[6] "For claims filed . . . before March 27, 2017, other medical evidence does not include a diagnosis, prognosis, or a statement that reflects a judgment(s) about the nature and severity of your impairment(s)[.]" 20 C.F.R. § 416.913(a)(3). Plaintiff's claim was filed on April 18, 2022. (Doc. 8-1 at 22.)

[wa]s largely not completed, lack[ed] explanation[,] and d[id] not cite to much objective evidence." *Id.*[7]

Medical records during the relevant period establish Plaintiff was able to drive for long distances, such as from Vermont to South Carolina. Plaintiff, however, reported that at times he had difficulty getting in and out of a car and driving short distances without pain. It was Plaintiff's burden to establish why he was both reporting long trips and vigorous activities such as softball and also reporting he could not engage in normal activities of daily living. The ALJ was entitled to find this discrepancy cast doubt on Plaintiff's testimony and his December 14, 2022 disability report.

Although ALJ Sutker concluded Plaintiff cooked, according to Plaintiff's testimony, he only makes quick meals because he is unable to "stand[] out there [and] cook[] something[.]" (Doc. 8-1 at 62.) This discrepancy was not material because the Consultants, whose opinions ALJ Sutker found persuasive, found that Plaintiff does not perform household chores or cook. *Id.* at 106, 114. Although ALJ Sutker should have been more accurate in her description of Plaintiff's activities, her overall assessment of Plaintiff's functioning was supported by substantial evidence because Plaintiff reported activities that included playing softball, driving long distances, and directing traffic as a firefighter. The record does not indicate if or when those activities changed.

"In considering activities of daily living, the issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence." *See Coger v. Comm'r of Soc. Sec.*, 335 F. Supp 3d 427, 436 (W.D.N.Y. Sept. 27, 2018) (alteration adopted) (citation and internal quotation marks omitted). In this case, Plaintiff's activities of daily living were not only inconsistent with Plaintiff's testimony but also inconsistent with the extreme limitations recommended by Dr. Hashem, who

---

[7] In multiple instances, Dr. Hashem either did not answer or replied "unknown" to the questions on the form. *See, e.g.*, Doc. 8-1 at 774-75, 777. In most other instances, he provided vague and generalized answers such as "pain" or "chronic pain[.]" *See id.* at 775.

noted Plaintiff was able to ambulate without assistive devices, had a normal gait and stance, and did not appear to be in acute distress. Dr. Hashem's opinion that Plaintiff could never bend, squat, kneel, or turn any part of his body not only conflicted with Plaintiff's activities, and was not endorsed by any other medical expert, but was at odds with the conservative treatment he recommended such as heat, stretching, pain medication, and physical therapy. Against this backdrop, there was no legal error in ALJ Sutker's evaluation of Dr. Hashem's opinion.

Plaintiff next contends that ALJ Sutker's finding that Dr. Seyferth's opinion that Plaintiff has "significant limitation of function," (Doc. 8-1 at 722) was "unpersuasive because it is vague and does not utilize vocationally relevant terms[.]" *Id.* at 28-29. He contends ALJ Sutker committed legal error because such a finding ignores the results of Dr. Seyferth's medical examination of Plaintiff. In finding Dr. Seyferth's opinion unpersuasive, ALJ Sutker acknowledged the opinions of Drs. Hashem, Youngren, and Lefkoe, who all found that Plaintiff had limitations due to his lower back pain, but who also noted that he did not use assistive devices and who did not rule out the requirements of light or sedentary work. Although her evaluation of Dr. Seyferth's opinion was not fulsome, Dr. Seyferth failed to fully explain the role played by Plaintiff's obesity on his functioning.

"The Second Circuit has found, as have courts in this District after [Social Security Ruling] 19-2p was issued, that, even if an ALJ does not explicitly discuss how a claimant's obesity affects his [or her] limitations, the ALJ's RFC determination should be upheld if the ALJ implicitly factors the claimant's obesity into the RFC determination by relying on medical reports that note the claimant's obesity and specify how obesity limits his [or her] functioning." *Cullen v. Kijakazi*, 2024 WL 564501, at *12 (S.D.N.Y. Feb. 9, 2024) (citing *White v. Berryhill*, 753 F. App'x 80, 81 (2d Cir. 2019)). "Courts have consistently held, however, that there is no obligation on an ALJ to single out a claimant's obesity for discussion in all cases, and that an ALJ's failure to address it explicitly does not warrant remand." *Sanchez v. Saul*, 2020 WL 2951884, at *30 (S.D.N.Y. Jan. 13, 2020) (alterations adopted) (internal quotation marks omitted) (quoting *Watson v. Astrue*, 2010

18

WL 1645060, at *4 (S.D.N.Y. Apr. 22, 2010)) (citing *Wilson v. Colvin*, 2015 WL 5786451, at *30 (S.D.N.Y. Sept. 29, 2015)).

In reviewing Plaintiff's claims, ALJ Sutker found that "[t]he preponderance of the medical evidence of record indicates that the [Plaintiff] has a history of . . . obesity."[8] (Doc. 8-1 at 26.) More specifically, in reviewing Dr. Seyferth's opinion, ALJ Sutker explained:

> In October of 2022, Dr. Seyf[e]rth noted that the [Plaintiff's] severe obesity is playing a role in the difficulty achieving improvement. Although this is not an opinion as to the [Plaintiff's] functioning, the undersigned agrees and notes that the [RFC] takes the [Plaintiff's] obesity into account.

*Id.* at 29.

The ALJ's consideration of Plaintiff's obesity is sufficient under controlling Second Circuit precedent. *See White*, 753 F. App'x at 81 ("[Plaintiff] argues that in making [the RFC] determination the ALJ was required to explain how he factor[s] [plaintiff's] obesity into his analysis of [plaintiff's] physical limitations. But the ALJ implicitly factored [plaintiff's] obesity into his RFC determination by relying on medical reports that . . . noted [plaintiff's] obesity."); *Cullen*, 2024 WL 564501, at *13 (finding ALJ properly considered the combined impact of plaintiff's obesity and other impairments where he stated "he fully considered the effect of the claimant's obesity in the [RFC] finding[]") (citation and internal quotation marks omitted).

The ALJ was not required to accept Dr. Seyferth's vague opinion of significant impairment of function which provided no specific limitations. "In [evaluating the] evidence, an ALJ is entitled to accept parts of a doctor's opinion and reject others." *Peter S. v. Comm'r of Soc. Sec.*, 2024 WL 4343661, at *6 (D. Conn. Sept. 30, 2024) (citing *Veino*, 312 F.3d at 588-89. In this case, the ALJ's RFC was supported by substantial

---

[8] Obesity is not in and of itself a disability. *See Browne v. Comm'r of Soc. Sec.*, 131 F. Supp. 3d 89, 102 (S.D.N.Y 2015). "In Social Security Ruling 19-2p ('SSR 19-2p') the Commissioner emphasized the need to consider the combined effects of obesity with another impairment because 'the combined effects of obesity with other impairment(s) may be greater than the effects of each of the impairments considered separately.'" *Cullen v. Kijakazi*, 2024 WL 564501, at *12 (S.D.N.Y. Feb. 9, 2024) (alteration adopted) (quoting SSR 19-2p, 2019 WL 2161798, at *22926 (May 20, 2019)).

evidence and reflected the consensus that Plaintiff suffered from lumbar pain that was exacerbated by his obesity. The ALJ imposed corresponding RFC limitations. In doing so, she did not commit legal error.

### 2. Consultants' Opinions.

With regard to the Consultants' opinions, Plaintiff contends ALJ Sutker improperly found their opinions persuasive because her analysis "does not explain why the agency consultants' opinions are more supportable or consistent tha[n] those of the treating and examining providers." (Doc. 11 at 8.) "An ALJ is entitled to rely on the opinions of both examining and non-examining State agency medical consultants, because those consultants are deemed to be qualified experts in the field of social security disability." *Douglas C. v. Comm'r of Soc. Sec.*, 717 F. Supp. 3d 289, 298 (W.D.N.Y. 2024) (alteration, citation, and internal quotation marks omitted). An ALJ may, but is not required to, compare and contrast every medical opinion. *See Salisbury v. Comm'r of Soc. Sec.*, 2020 WL 6384233, at *8 (W.D.N.Y. Oct. 30, 2020) ("[I]t was within the ALJ's discretion to compare and contrast the various medical opinions, along with all the other relevant evidence, to resolve any conflicts in the evidence and determine [p]laintiff's RFC.") (citations omitted).

Both Consultants found that Plaintiff had degenerative disc disease at the L4-L5 and L5-S1 levels. As a result, they determined exertional limitations were appropriate, including a four-hour limit on standing, a six-hour limit on sitting during an eight-hour workday, a twenty-pound limit on occasionally lifting and/or carrying, and a ten-pound limit on frequently lifting and/or carrying. The Consultants also determined Plaintiff should avoid extreme cold conditions, as well as wetness, vibrations, and hazards such as machinery and heights.

ALJ Sutker found the Consultants' opinions were "persuasive because they are consistent with the substantial evidence of record and the longitudinal treatment record." (Doc 8-1 at 28.) She determined their conclusions were consistent with other medical evidence, such as Dr. Lefkoe's conclusions that "MRI findings did not explain [Plaintiff's] symptoms" and that Plaintiff had "generally intact neurological exams with

no red flags[.]" *Id.* The Consultants' opinions were supported by "[Plaintiff's] report of
no numbness and weakness in the lower extremities, reported improvement with
chiropractic care[,] and limited use of medications." *Id.* ALJ Sutker also cited Plaintiff's
"ability to drive, play softball, cook[,] and attend fire department meetings." *Id.*

The ALJ was entitled to rely on the Consultants' opinions as substantial evidence.
*See Felicia A. o/b/o O.A. v. Comm'r of Soc. Sec.*, 2024 WL 3696293, at *6 (N.D.N.Y.
Aug. 7, 2024) ("As a threshold matter, the opinions of consultative examiners and state
agency non-examining consultative physicians can constitute substantial evidence in
support of an ALJ's decision."); *see also Jonisha M. G. v. Comm'r of Soc. Sec.*, 2024 WL
1219696, at *2 (N.D.N.Y. Mar. 21, 2024) ("To determine on appeal whether an ALJ's
findings are supported by substantial evidence, a reviewing court considers the whole
record, examining the evidence from both sides, because an analysis of the substantiality
of the evidence must also include that which detracts from its weight.") (internal
quotation marks omitted) (quoting *Williams on Behalf of Williams v. Bowen*, 859 F.2d
255, 258 (2d Cir. 1988)). There was also no legal error in the ALJ's conclusion that the
Consultants' opinions were persuasive.

C.   **Whether the ALJ's Finding that Plaintiff's RFC Allowed Him to
      Perform Work that Exists in Significant Numbers in the National
      Economy is Substantially Supported by the Evidence.**

Plaintiff argues that ALJ Sutker erred in finding him able to make a successful
adjustment to other work that exists in significant numbers in the national economy. He
points out that the job statistics provided by the VE are not regional and that the
sedentary jobs identified by her "are virtually nonexistent[.]"[9] (Doc. 11 at 12.)

The SSA requires the Commissioner to consider a claimant's "ability to adjust to
other work by considering [his or her RFC] and the vocational factors of age, education,
and work experience . . . . Any other work (jobs) that [a claimant] can adjust to must exist

_____

[9] Plaintiff also argues the ALJ's determination is erroneous because the VE failed to discuss the
level of general educational development each job required. In posing her hypothetical to the VE,
however, ALJ Sutker instructed her to consider "a younger individual *with a high school
education*" and Plaintiff's past work experience. (Doc. 8-1 at 76) (emphasis supplied).

in significant numbers in the national economy (either in the region where [the claimant] live[s] or in several regions in the country[])." *Jessica V. v. Comm'r of Soc. Sec.*, 2022 WL 737470, at *4 (W.D.N.Y. Mar. 11, 2022) (quoting 20 C.F.R. § 404.1560(c)). "It is insufficient . . . if there are only 'isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where' the claimant lives." *Hernandez v. Berryhill*, 2018 WL 1532609, at *16 (D. Conn. Mar. 29, 2018) (alteration adopted) (quoting 20 C.F.R. § 404.1566(b)).

VE Jubrey testified that Plaintiff could perform sedentary work as a document preparer (approximately 15,000 jobs nationally), a call-out operator (approximately 3,000 jobs nationally), or an addresser (approximately 2,000 jobs nationally). However, "numerous courts have recognized[ that] the document preparer and addresser clerk jobs are obsolete[.]" *Paul Thomas C. v. Comm'r of Soc. Sec.*, 2024 WL 4688875, at *4 (S.D.N.Y. Nov. 5, 2024).

VE Jubrey also testified that Plaintiff would be able to perform the light jobs of cashier II (approximately 53,000 jobs nationally), mail clerk (approximately 12,000 jobs nationally), or marker (approximately 130,000 jobs nationally). To meet his burden at step five "the Commissioner need only show one job existing in the *national economy* that claimant can perform." *Lillis v. Colvin*, 2017 WL 784949, at *6 (D. Conn. Mar. 1, 2017) (internal quotation marks and alteration omitted) (emphasis in original) (quoting *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011); *see also Consiglio v. Berryhill*, 2018 WL 1046315, at *8 (D. Conn. Feb. 26, 2018) ("[T]he number of jobs available in the local economy is not relevant, because the ALJ determined plaintiff could have performed a significant number of jobs in the national economy.") (citation omitted).

Agency policy states that "SSA adjudicators may not rely on evidence provided by a VE, VS, or other reliable source of occupational information if that evidence is based on underlying assumptions or definitions that are inconsistent with [the SSA's] regulatory policies or definitions." SSR 00-4P, 2000 WL 1898704, at *3 (Dec. 4, 2000).

SSA regulations further explain that:

> The major difference between sedentary and light work . . . is that the
> frequent lifting or carrying of objects weighing up to [ten] pounds (which is
> required for the full range of light work) implies that the worker is able to
> do occasional bending of the stooping type; i.e., for no more than one-third
> of the workday to bend the body downward and forward by bending the
> spine at the waist.

SSR 83-14, 1983 WL 31254, at *4 (Jan. 1, 1983).

As a result:

> An ability to stoop occasionally, i.e., from very little to one-third of the
> time, is required in most unskilled sedentary occupations. A *complete*
> inability to stoop would significantly erode the unskilled sedentary
> occupational base and a finding that the individual is disabled would
> usually apply, but restriction to occasionally stooping should, by itself, only
> minimally erode the unskilled occupational base of sedentary work.

SSR 96-9P, 1996 WL 374185, at *8 (July 2, 1996) (emphasis in original). Only Dr.

Hashem opined that Plaintiff could never bend, squat, kneel, or turn any part of his body

and the ALJ properly rejected that opinion as unsupported by the record.

Pursuant to the VE's testimony, and considering only positions that actually exist,

Plaintiff could perform the position of call out operator, a sedentary job, as well as three

positions at the light exertional level, even with limitations on what generally constitutes

light work.[10] Although "[w]ithin the Second Circuit 'courts have refused to draw a bright

line standard for the minimum number of jobs required to show that work exists in

significant numbers[,]'" *Koutrakos v. Colvin*, 2015 WL 1190100, at *21 (D. Conn. Mar.

16, 2015) (internal quotation marks omitted) (citing *Barbato v. Astrue*, 2010 WL

2710521, at *7 (W.D.N.Y. July 7, 2010)), "courts have adopted a relatively low threshold

---

[10] "Light work involves lifting no more than [twenty] pounds at a time with frequent lifting or
carrying of objects weighing up to [ten] pounds. Even though the weight lifted may be very little,
a job is in this category when it requires a good deal of walking or standing, or when it involves
sitting most of the time with some pushing and pulling of arm or leg controls. To be considered
capable of performing a full or wide range of light work, you must have the ability to do
substantially all of these activities. If someone can do light work, we determine that he or she can
also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity
or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

number."[11] *Barbato*, 2010 WL 2710521, at *7. As a result, ALJ Sutker's finding that Plaintiff retained an RFC to perform work that exists in significant numbers in the national economy is supported by VE Jubrey's testimony and substantial evidence, and remand is not warranted on this basis.

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiff's motion for an Order reversing the Commissioner's decision, (Doc. 11), and GRANTS the Commissioner's motion for an Order affirming the Commissioner's decision. (Doc. 16.)
SO ORDERED.

Dated at Burlington, in the District of Vermont, this 22nd day of August, 2025.

Christina Reiss, Chief Judge
United States District Court

---

[11] "While there is authority to suggest that 4,000-5,000 jobs are not a significant number, a total number over 17,000 is considered sufficient to satisfy the Commissioner's step five burden." *Tafazwa S. v. Comm'r of Soc. Sec.*, 2023 WL 6390625, at *7 (S.D.N.Y. Oct. 1, 2023) (internal citation omitted); *see also Mota v. Comm'r of Soc. Sec.*, 2022 WL 464098, at *12 (S.D.N.Y. Feb. 15, 2022) (finding "the ALJ properly accepted the [VE's] testimony that there were jobs existing in significant numbers in the national economy that [plaintiff] could perform[]"where there were 9,600 jobs in the national economy); *Chaderick G. v. Comm'r of Soc. Sec.*, 2024 WL 4767031, at *7 (S.D.N.Y. Nov. 13, 2024) (finding no reversible error where ALJ relied on VE's testimony that there were 50,000 jobs in the national economy plaintiff could perform).